WATSON (PETERSON v.). See Case No. 11,-037.

WATSON v. REYNOLDS. See Cases Nos. 17,274, 17,275.

---

## Case No. 17,288.

### WATSON v. The ROSE.

[1 Pet. Adm. 132.] [1]

District Court, D. Pennsylvania. 1806.

AMERICAN SEAMAN — IMPRESSMENT BY FOREIGN VESSEL—RIGHT TO WAGES.

[1. A mariner on a neutral vessel, carried off by captors, on the arrest of the ship for adjudication, participates in the general circumstances of all the crew as to the fate of the ship, and if she is discharged by the court of the captor he is entitled to his wages.]

[2. A sailor on a neutral vessel, who is impressed, while the ship is permitted to proceed, cannot recover his wages from the vessel unless he thereafter rejoins her.]

[Cited in Hanson v. Rowell, Case No. 6,043.]

The libellant [James Watson], being a citizen of the United States, and one of the crew of an American vessel, was impressed by a British cruizer; and the ship permitted to proceed on her voyage. The case was opened with a view to obtain wages for the voyage, under principles settled in this court, relating to mariners taken and carried off by force,

out of vessels taken and retaken and proceeding to their ports of destination, and earning freight.

BY THE COURT. I have never extended any decision so far as to reach this case, when unconnected with other circumstances. I think it would be stretching the principle to an extreme. This practice of impressing our seamen, has been often and ably discussed, in other departments of our government; and I am under no necessity to enlarge upon it. Seamen, really American citizens, are not legally amenable to this outrage, and tyrannical exercise of belligerent force. But mariners, in neutral ships, are lawfully subject to be carried in by belligerents, for adjudication, in cases warranted by treaties, or the laws of nations. The person of a mariner belonging to a belligerent nation, is, as a member of that nation, subject to capture by his enemy.[2] But one of a neutral country is not liable to restraint, except where his case relates to, and is connected with, the ship, in which he is found. I know that some instances may be cited, of seamen carried off by pirates, or sea rovers, which may be deemed to bear on this question.[3] But I endeavour, as far as practicable, and consistently with general principles, to put every case on its own circumstances. A mariner of a neutral vessel, carried off by captors, on the arrest of the ship for adjudication, participates in the general circumstances of all the crew, as to the fate of the ship; and this as a member of the crew. See Hart v. The Littlejohn [Case No. 6,153]. If she is discharged by the court of the captor, he, in common with others, has the advantage of saving his wages; though the neutral merchant incurs both loss, expense and inconvenience, by a casualty to which he is liable, as part of the terms on which he enjoys his trade. The separating the crew, by carrying off one or more seamen, is an injury to the neutral merchant, who is thereby reduced to the necessity, if his vessel is released, of hiring other seamen to complete his crew. But, the neutral seaman, abstracted by this unjustifiable act of power, should lose none of those rights, to which he is entitled as a partaker in the fate of the ship; though, after separation, further outrage should be added, by compelling him to serve in a belligerent ship. It lies with the merchant, to charge, in his account of damages against the captors, the extra expense occasioned by the dispersion of his crew. But one impressed, where the ship is permitted to proceed, is personally wronged; and the more so, by being prevented from fully executing his contract, and unjustifiably detached from the

---

[1] [Reported by Richard Peters, Jr., Esq.]

[2] [See note at end of case.]

[3] The better opinion of writers, on this subject, seems to be, that if a seaman is carried off by a pirate, as a hostage for the release of the ship and crew, his wages and ransom must be paid. But if forcibly and unconditionally taken, his case stands on separate grounds, and his contract is interrupted, though jurists are not generally agreed on this point.

benefits, common to the rest of the crew. He must rely, whatever may be the result, on the protection due to him by his government, for the redress he is entitled to, as well for losses sustained, as personal injuries so unwarrantably suffered. The unlawful impressment is an injury done to him, specially and individually; and has no ingredients common to all the crew.

There will often arise some anomalous occurrences, form what general rule we may. In one or two instances, I have decreed wages for the voyage, where sailors were carried off from a ship being arrested, with intent to send her in for adjudication, but those left on board regained her, resumed her former course, and she arrived at her port of original destination, and earned her freight. It was alleged, that extra payment had been made to those who brought in the ship. But principles cannot fluctuate with the debit and credit sides of accounts. They must be general; and special cases, not clearly marked with distinct character, must yield to them. The tints of distinction in these instances, from the general class of cases, governed by the principles before stated, were not sufficiently strong, to form exceptions to the general rule. In a former case, where a seaman was impressed, and the vessel permitted to proceed, I decreed wages for the voyage; because the seaman, after a short detention, rejoined his own ship, and performed his duty during the remainder of the voyage. Such temporary interruptions should have no more effect on entire contracts, than short detentions, on insurances; which are not affected when a ship, being for a time in jeopardy, but speedily restored to safety, arrives at her intended port. Wages for the voyage were also decreed to a mariner who had been impressed, escaped, and followed the ship; and overtaking her at a port in the course of her voyage, tendered himself as ready to re-enter, and perform his contract, but was refused. I have pursued this principle uniformly. If seamen are separated by the vis major, and it is, at any time during the voyage, in their power to rejoin the crew, and they do not, I have refused wages thereafter. Where they comply with this obligation so far as they can, by following the ship and offering to re-enter, but are refused, I consider this tender and refusal, according to the maritime laws, a restoration to their contract. So also of sailors having committed faults, repenting and tendering their services and amends in reasonable time. The wise policy of maritime laws, looks farther than cupidity permits individuals to see, when their immediate interests render them regardless of general advantages. These laws enjoin liberality to relieve their misfortunes, and toleration for the faults of seamen. However much these are morally to be deplored, and should be repressed and discouraged, they produce necessities in mariners, which compel a perseverance in their occupation, without an intermission. Thoughtful, calculating men, though anxious, as mariners generally are, to get, without their propensities to dissipate, both their time and their money, would either never undertake, or soon abandon, the subjection, hardships, vicissitudes, and dangers of a maritime life.

The system of maritime laws is, in its combinations, just; and calculated by the experience and wisdom of ages, for the support and prosperity of commerce. Few, even of the most eminent common lawyers study this system in all its relations. They view only particular parts, as they are occasionally employed in them. The branch of it, relating to mariner's contracts—on which Photier (Photier, Louages des Matelots), among others, has given us a most valuable discussion—has been peculiarly, and by those who have classed it among the inferior grades of jurisprudence, too fastidiously, neglected. It is not then surprising, that others should form partial and erroneous judgments (and these not seldom excited by immediate interest) on this complicated subject; which will be found, even to those much travelled in other departments of law, a new, and unexplored region. It is much to be regretted, that more attention is not paid to this essential requisite, in both legal and commercial education, in a country rising to the first rank of capacity for naval, and in the actual enjoyment of commercial, importance. On a careful investigation, it is questionable whether it will be found, that our laws, loosely and obscurely worded, have introduced salutary alterations. Like intended improvements on the common law, they leave the system mutilated; and, with a very few exceptions, the worse for attempts at reformation. The framers of maritime laws, knowing that seamen are, by the nature of their employment, subject to peculiar failings and vices, the offspring of unpolished manners and hardy, rude, and fearless habits, have calculated their codes for reformation, where practicable, and for punishment, where this cannot be effected. Heavy forfeitures, pecuniary mulcts, and corporal inflictions (many now obsolete and disused) are to be found in those laws, frequent and severe. But, where these can be balanced by indulgences and encouragements, they are always enjoined; to the end that this vocation may not be rendered odious and forbidding; so as to deter the subjects or citizens of commercial states, from entering into an occupation so radically necessary, and all-important, to the commerce, and only sure defence, of commercial countries.

[NOTE. Respecting the statement of the court in this case that the "person of a mariner belonging to a belligerent nation, is, as a member of that nation, subject to capture by his enemy," the following annotation is reprinted from 2 Pet. Adm. 476:]
"This position was taken to be generally agreed, because universally followed in practice by belligerent nations, from the earliest to the most modern periods of military and naval history. Practical precedents contradictory to it would give pleasure to every friend to man-

kind. None have more uniformly warranted this assertion, than the two great and powerful rivals. whose emulation, ambition and endless conflicts have, from remote times to this day, incessantly agitated every quarter of the globe. One of them has recently promulgated opinions to the contrary; and adopted a practice for the accomplishment of his new theory, so unpromising. that it violates all its principles. France at no time has intermitted the practice generally: nor has it been confined to capturing and restraining the liberty of a subject of her enemy. The French directory, by a decree, March 2d. 1797, ordained, that an American seaman found on board of a British ship, though impressed into the service (for this point was not suffered to be investigated), should be treated as a pirate. Thus subjecting an innocent neutral to capital punishment by one enemy, when he was the victim to the violence and aggression of the other. Restraints on, and violence to. unarmed individuals of their enemies, found on land or on the sea, are without number, and are not confined to revolutionary periods. By an ordinance of France recently practiced upon, though promulgated in 1744, a subject of an enemy is not only considered (according to the principles and effect of that law) as liable to capture in any ship, but if a vessel is commanded by him, she is confiscable as prize. though the property do not belong to a belligerent. American crews have lately been captured, and ships and cargoes burnt and destroyed, not for attempts to enter blockaded ports, or being engaged in illicit commerce, but on the high seas, when pursuing fair and blameless enterprizes, lest, per chance, the progress and situation of a French squadron should be discovered. See [Howland v. The Lavinia. Case No. 6,797], and, among numerous other authorities, 4 C. Rob. Adm. 143, 144, 145, for the English opinion as to prisoners of war taken in private ships; and in a case of one of their own subjects. Their practice has, for ages, authorized this opinion, as it respects their enemies: nor have neutrals been spared, when their objects required violence, or temporary restraints. It has been generally the policy, as it was deemed the interest of England to embarrass, as it has been that of France to encourage, neutral commerce; though some occasional exceptions may be found, in the conduct of both nations. The changes produced in this eventful period, are so far beyond expectancy or calculation, that, if. in former times. they could have been predicted, they would have been called the dreams of chivalry and romance. A revolution in principles long settled, would not be more unlooked for and improbable. While there is a contest for ascendency, between the sceptre formed from a conqueror's baton, on the land, and the trident predominant on the ocean, it does not seem probable that commercial halcyon days on the sea. or the millennium of peace and security on the land, will soon arrive. The practice which gave rise to the assertion I incidentally made, is therefore likely to continue. Principles are seldom to be tested or proved, by the professions of jealous and contending nations, whose actions are regulated more by policy and power (and sometimes by general or partial inferiority) than abstract, however commendable. opinions of humanity or justice. No solid and safe dependence can be placed on principles, either as they respect the freedom of persons, or the rights and security of property, as we have recently seen them avowed. when present convenience. precarious power, and instable policy, excite their promulgation. Our nation, though now profiting by commerce growing out of the deadly feuds which distract and ruin that of other trading nations. should beware of seduction into any principles, which however convenient and lucrative they may now be. may hereafter, if the state of things changes with us from neutrality to war. be highly injurious. and rebound upon ourselves. Azuni had not anticipated the present avowed opinions of the ruler of his favorite nation, on all the points assumed in a late imperial declaration. He has frequently indulged speculations and visions upon some of the subjects of it; yet his opinions are, in many important instances, directly opposed to it. though he is generally the eulogist and zealous advocate of France. He has treated more at large, and systematically, on the rights and obligations of neutrality, than most other writers. His work is among·the most modern treatises. on the momentous topics. to which our interests and safety attract our attention. On these accounts (though in some of his opinions I do not concur) I have often referred to it: and not from any preference of it to the productions of other respectable writers. The publication of it in our language, is also enriched with learned and valuable notes, and citations of authorities, both by the author, and the American translator. Those of the latter are interesting, as they refer to circumstances and doctrines affecting our own country, and its laws and regulations, as well as in its interior government, as those which apply to our exterior relations."